May it please the Court, my name is Michael Mallett Loeb and Loeb on behalf of the Appellant Defendants EDebitPay, Dale Paul Cleveland, and William Wilson. Your Honors, there are three issues I'm hoping to discuss with you today. One is the matter in which Judge Wright interpreted the final order that was the basis for the contempt proceeding against the defendant appellants. The second is whether Judge Wright abused his discretion in finding the super elite marketing product in violation of the final order. And then the third issue I'm hoping to discuss with your Honors is the contempt sanction that was ordered against the defendants. Your Honor, I think we need to start the analysis of this case on the interpretation of the consent order. It is the defendant's position, the appellant's position. Could you speak up a little bit? I'm sorry, Your Honor. Usually the volume of my voice is not a problem, but I will speak up. In finding contempt in this case, Judge Wright ignored expressed language in the consent order. And in particular, we're talking about the provisions of 1B and 1E5. In looking at 1E, the FTC, I'm sorry, in 1B, the FTC said that the appellants violated the consent order because they essentially had marketing that misrepresented expressly or implication facts material to a consumer's decision. Essentially, the FTC relied on the introductory language of the paragraph 1B. There are six enumerated provisions that follow that introductory paragraph. Just before the stuff that follows, it says that the appellant has the right to purchase any product or service, including but not limited to. This is true, Your Honor. Well, doesn't that just show that those are illustrative and not exclusive? They may be illustrative, but they are relevant. And they define the context and the scope of what is required of the appellant. When it says in 1B that they are prohibited from misrepresenting and so forth any material fact for the purchase of any product or service, isn't that pretty broad? It is extremely broad. Well, why isn't that sufficient? Because it lacks the specificity necessary to be enforceable. Why? Well, let's see. The FTC submitted to Your Honors on July. Why should they be allowed to sell any product or service with misrepresentation of material fact? In fact, under Section 5 of the FTC Act, an entity is not permitted to misrepresent its products or services. That's a violation of Section 5, and it's very vague and ambiguous. The law is very vague and ambiguous as it's set forth. There's lots of case law that interprets Section 5 of the FTC Act. The FTC Act provides that businesses shall not engage in unfair or deceptive conduct. But to say that, you know, nobody is saying that the defendants are permitted to misrepresent their product. The question before Your Honors is, is there contempt here under the final order that was entered by Judge Wright? Well, even if you're right about that, and I'm not sure, but even if you are, isn't it time to complain about it before you sign it? No, no, no, Your Honor. There is nothing wrong with the order when all of the language that is there is read into the order. The problem is that Judge Wright took a construction of the order where language the provisions of subsections 1 through 6 are effectively have no meaning. Well, they give notice to the defendant of certain of the things he ought to avoid. That doesn't mean that's the only thing that he can do with everything else. It means here are things that tell you specifically things you better not do. But we're not trying to cover everything you can't do. We're telling you that here are some things specifically that you can't do. But you can't do what's said in the introduction. You can't misrepresent any fact material to a consumer's decision to purchase a product. It's nice that the judge gave you some specific things to look out for, but he said that's not all. Essentially, if the enumerated provisions 1 through 6 are taken out of the final order, effectively the order says don't violate Section 5. Do not misrepresent any fact material to any consumer regarding any product or service. That is as vague as a direction as one could have. The FTC submitted to your honors in July of this year, a month ago, a case that I think sheds some significant light on this issue, and that's the Global case. And the language that the Court utilizes in that case I think is very applicable to this case. My apologies, Your Honor. The Court in Global says, and this is page 15, I'm sorry, page 17 of 23 in the July 24, 2012, letter submitted by the FTC. And the Court was comparing a do not violate the law provision in McComb v. Jackson bill to the provision that was applicable in SEC v. Global. What the Court said was like the injunction here talking about the McComb injunction. These regulations contain specific commands and a defendant restrained from violating these commands would be able to determine what the conduct, what conduct the injunction addressed. Thus, while these restraints may be broad in terms of the scope of the conduct captured by the injunction, the restrained party has fair notice of what conduct will risk contempt. The Court continues on. The decree is vague when the delineation of the prescribed activity lacks particularity. And essentially what Judge Wright's order would provide if the enumerated provisions are read out of the final order is you can't misrepresent any material fact, or in this case, omission, because this case is really an omission case. You can't fail to tell the consumer a material fact about any product or service from any defendant. And what's wrong with that? It is not specific, Your Honor. And if you look at the final order, in all other respects, the order is specific. It says, you know, in 1 through 6, it's telling the defendants exactly the behavior they have to not do. And those enumerated provisions are tied directly to the focus of the case that, of the underlying case. And the focus of the underlying case, the fundamental purpose of this order was to address the allegations that the defendants withdrew money from bank accounts without authorization, which turned out that the evidence did not support that allegation, both in the underlying case and in the contempt proceeding. And the second was to ensure that the defendants adequately disclosed the fee provisions that related to the debit card product. Those were the fund – those were the focus of the underlying action. And if you read the final order, the provisions, the provisions that have specificity tie directly to the focus of the underlying case. Well, but here the Century Platinum product was similar in kind in nature, although not identical to the subject of the underlying litigation. Isn't that fair to say? No, Your Honor. It's not fair to say. And the reason it's not fair to say that is, in the underlying case, there was a debit card product. The FTC alleged that the defendants didn't adequately disclose that there was a charge attendant to that product. With the Century Platinum, it's a shopping club. The question was, did the defendants provide adequate disclosure that it was – that  was the issue in the second case. Now, the net spend card, that is also part of the appeal. I do agree, Your Honor. The net spend card, the debit card, is absolutely directly related to the underlying case. There's no doubt. But even the Century Platinum card, consumers get a card in the mail, and the inadequate failure to disclose is that these cards could only be utilized to purchase from a particular store. But it still operates as credit, not too different in kind from the underlying problems that the final order was designed to address. True? Actually, remember, there are two Century Platinum marketing pieces, Your Honor. There's the StartACreditDirect.com marketing offer. And I believe there was a card in the picture, though the membership does not revolve around a card. And then there's the Super Elite offer, Your Honor. And in the Super Elite offer, unlike the StartACredit.com offer, there is an indication that it was a membership line of credit, or a membership credit line is the exact phraseology. And, Your Honor, for the – because the exhibits and the record were on disk, we did bring bluffs if it assists the Court in discussing the marketing pieces. But these are two different, very different marketing pieces because one does have the disclosure and the other one did not. The defendants on this are not appealing the StartACreditDirect.com portion of the order. And that is the marketing pieces that did not have the additional language tying the credit line to the membership. And remember, it's the FTC's position that what the defendants did wrong was that they led consumers to believe that consumers were getting a general line of credit that can be used anywhere at any time. Those two pieces are very different. I don't want to interrupt you, but you had three issues you want to cover, and we're getting close to the end. I see that. I'm down to four minutes, Your Honor. Thank you for saying that. There are two provisions in the final order that we need to discuss. One is 1b, and it's enumerated provisions, and the other is 1e5. That essentially has a very similar problem, which is that the court disregarded the example that is on 1e5. And 1e5 provides that defendants should not fail to clearly and conspicuously disclose prior to the time when a consumer applies for a purchase, any good or service offered by any defendant, the following material information where applicable. So now we are very specifically looking at the following information, and then provision 5, which is what the FTC relies on, says the material attributes of the product or service offered or marketed. And then there's the example, that the product has the characteristics of a credit card, debit card, or stored value card. Defendants position that that language has meaning. The language has to be read into the order. What does e.g. mean? What does it mean is what we come down to. No, what does e.g. mean? It means for example, and then it provides the examples. The question is, what do those examples mean? What do they stand for? What guidance are they providing to the appellants for the purposes of understanding compliance with that section? But it has meaning. Those words have to be read in, and Judge Wright disregarded those words. Let me ask you, let's suppose we say, just for the sake of discussion, that he didn't abuse his discretion in interpreting the order that way. Then we come down to the sanctions. What's the problem with the amount of the sanctions? Given the circumstances of the case, Your Honor, they are extremely, they are extreme. They are extreme for a number of reasons. One is the fact that we don't have, we have a situation where if there's contempt, we don't believe that there's contempt under the phraseology of this language, it's not contempt as you would have in Trudeau or affordable meaning.  But if he lost that. If he says it is contempt and if he's within his right to find that, what's wrong with the amount? The amount is extreme given the circumstances of the case. He says that's the amount of the consumer's loss. Understood. If that's correct, then why shouldn't they have to discourage that? If the Court is asking is it legally, does Judge Wright have the legal authority to award consumer redress in a sanction case, the answer is yes. But the judge also has an obligation to take into consideration the facts and circumstances that surrounded the contempt. And I, and Judge Wright did not take those into consideration when ordering the most extreme monetary penalty that he had the right to award. What did he, how did he blow that part of it? What did he, what should he have taken into account? He didn't take into account any of the extenuating circumstances that involved this. Which were what? Which, for example, under the starter credit, and I see that, I intended to reserve, Your Honor, but I'm down to a minute, which included one. When the starter credit advertising was initiated, it was initiated while E-debit pay was under receivership, and the court-appointed receiver both had the obligation and the fact show that had the ability, and we believe did, review the marketing operations of the company. The defendants are willing to take responsibility for that marketing piece, but it is of the receiver. Number two. The defendants were in continuous communication with the Federal Trade Commission subsequent to the final order, including sharing marketing information with the FTC. The formatting of the marketing piece, the superlative marketing piece, had a genesis from another marketing piece that the FTC had commented on. There were continuous communications between the commission and the defendants. And they sent them a letter saying this stuff's fine, go ahead, run with it or anything like that? They did not send a letter saying this stuff is fine, go ahead and run with it. No, they did not, Your Honor. But as I said, there were continuous communications with the commission. There's even an e-mail from Mr. McCown to the Bureau back in Washington talking about how cooperative the defendants and responsive the defendants are to any inquiries by the Federal Trade Commission. Did the receiver and the FTC know contemporaneously that there were thousands of complaints coming in as a result of the advertising of the product? They knew. In fact, the FTC probably knew better than the defendants did because the FTC doesn't share their consumer database information with defendants until a case is initiated. So the FTC probably knew better than anybody whether there were complaints or not. Thank you, counsel. We'll give you a minute or two for rebuttal. Thank you, Your Honor. May it please the Court, Leslie Rice-Mellman for the Federal Trade Commission. I have little to add beyond what is in the commission's briefs. With regard to the interpretation of the consent order, it's the commission's position that defendants have taken a very, I must say, offbeat approach to what is a very straightforward order. It is broad, but it clearly indicates that the examples are illustrative, that they're not exclusive. And in addition to the broad prohibition on making misrepresentations, there's a specific provision, IE5, that requires specific disclosures. So this case involved both blatant misrepresentations about the true status of the offering, which was a shopping club, not a line of credit, and consumers needed to make their purchases specifically from an online catalog. This is contrasted greatly with the offer that was put out there to consumers both in e-mails that drove consumers to defendants' websites and on the websites themselves, that consumers were primed to expect that this was a general line of credit. The distinction that defendants would offer as to the, since liability is not at issue except for sanctions on the start of credit, the super elite offer did not contain any disclosures that would correct that misimpression for consumers. There's the addition of, in tiny print, membership credit line. That does not tell consumers the true nature of the offer, the true nature of the offer, as stated earlier, was an online shopping membership that was strictly limited to a catalog that consumers could access online. I think we can understand what the violation is. The question really was whether it's covered by the broad language or not. But let me ask you, let me ask you this. Mr. Mallow makes the point that there was some, what he calls, communication between his clients and the FTC that would have, I don't know, caused these folks to think they could do what they were doing. Yes, Your Honor, I'm happy to address that. What Mr. Mallow has not indicated, and this is addressed in our briefs, that to the specific advertising pieces at issue in this appeal. And that was, this whole idea that there was an exchange of communications concerning these advertising pieces was completely debunked at the hearing on the commission's application for contempt in the testimony both by FTC attorney McCown in our Western Region office and by the concessions of the defendants. So that, if the defendants were relying on those communications, and I can't say that this was an ongoing series of communications, to extrapolate as to a different advertising piece, they are definitely at risk. How an ad is deployed, particularly online, is highly dependent on the context. And this is the context, the visuals that accompany it, any, for example, in this case, there were emails and flashing banner ads that primed consumers to expect a certain offer when they arrived at the web pages. None of this was involved in the communications that existed. The FTC cannot be, there is no preapproval process. The FTC at no time indicated that these ads were approved. And moreover, the sequence that Mr. Mallow suggested existed is not correct, because the starter credit program was already in force and out there before any communications, before there were any communications as between the FTC and the defendants. So the time sequence just doesn't work out. Did I understand you correctly? I don't know how this works, but did I understand you correctly to say there is no preapproval process One can ask staff for their informal views as to a particular advertising piece, but to the extent there's any feedback, this is, nothing is stamp approved, because the commission recognizes that this would put consumers and the commission in danger of, unless there are many, many caveats, and usually if this is done, usually there are caveats that are expressed to somebody who comes, that this is just an informal request for advice, but the FTC is not in a position to be formal compliance counsel for every defendant or every potential defendant out there. Otherwise the commission would never have an opportunity to bring any enforcement cases. And the context, because the context of ads in the commission's experience is so important, that when staff is reviewing an ad and trying to give guidance, it's always with the caveat that this cannot be final, because there's so much in terms of consumer perception that depends on the total context. I take your point, suppose though they rely in good faith on this kind of informal, not binding advice, would a district judge be within his rights to take that into account in weighing the sanctions to impose? I don't think that the good faith would apply in that case. The question is, when defendants sign a consent order, they assume responsibility for making sure that they comply with it. They cannot shift the responsibility to FTC counsel. Nobody's talking about shifting responsibility. If you take two defendants, one of whom made it clear I'm going to try to get away with something and I don't care what the commission or the court thinks, and I'm just going to do this anyway, and you had another defendant who had tried to discuss it with the commission and said to them, this is what we're going to do, and the commission replied, but still he didn't comply. After attempting to obtain some views, you might want to find a difference in the penalty between the two. Judge Silverman didn't ask, do you have to do it? He said, would a district judge who said this is a relevant factor and I'm going to impose a lesser faction, would he have the right to do that? And I would assume your answer would be yes, a district judge. I agree, Your Honor. I think a district court certainly would be acting within the scope of his allowable discretion in taking that into consideration. However, this is not an appropriate case because this program, a variant of this program, was already out there at the time that, while the ink was still drying on the consent decree. So in this case, I think Judge Wright acted well within the scope of his discretion and acted properly in awarding a full sanction for the entire amount of consumer losses. I would like to address the idea that, well, in addition to the fact that it was already out there, let me just add another point, this was over a period of approximately 18 months, so this was not just a one-time slip-up. The idea that the order is invalid because it was an impermissible obey the law injunction is just incorrect, an incorrect statement of the law. First of all, the order doesn't simply ---- I don't think that point was ---- it was argued in the brief, maybe, but it was not argued this morning that it was an obey the law injunction. I don't think that was ---- I didn't hear that term used. Is that prohibited? I understood that counsel was putting forward the argument that the order was just telling defendants to obey the FTC law, FTC Act. And that's as I understood ---- Would that be improper, an injunction that says don't violate any law? Don't violate any law, that would be improper. That's not what this order does, nor does this ---- It would be improper? If it just said don't violate any law. Now, there are ---- So if you don't violate this statute by repeating the terms of the statute, would that be unlawful? If the order simply said do not engage in unfair or deceptive acts or practices or methods of competition, I think that would be too broad, but that's not what this    It just says don't violate any law. Now, there are certain misrepresentations as to material facts, and then as to material facts, you must make certain specific disclosures. Now, there are ---- there's no issue here, and in fact, defendants don't argue that this was ---- this is clearly a material fact that was misrepresented. It goes to the very nature of the product that is being offered. In fact, it would have been far easier for defendants to simply advertise in a straightforward way what it is they were offering instead of requiring consumers to go hunting through various fine print disclosures that in and of themselves were still ambiguous. So this is not simply telling consumers to ---- not simply telling defendants to go hunting through various fine print disclosures that in and of themselves  It's telling them that if the order simply said do not engage in unfair or deceptive acts or practices or methods of competition, that is very broad, and that's not what is at issue here. Unless the Court has further questions, I think I've covered all the points. Thank you. I will give you a few minutes. Thank you, I appreciate that, Your Honor. To be clear, defendants do not argue that the final order is invalid. Defendants argue that Judge Wright's interpretation of the final order is what is invalid by ignoring specific language in the order and reaching his determination on contempt. The FTC's position is very telling. The FTC's position is very telling. It's not just a matter of saying don't misrepresent any information to a consumer. It's essentially saying the same thing. In my counseling function, if I tell my clients, oh, by the way, just don't misrepresent any material fact and don't provide them examples or more guidance, I've told them nothing. That's essentially how this order has to be read to find contempt. Your Honors, it shouldn't be a close call on a contempt. Assuming that you lose on that argument, do you have any facts showing a reasonable effort to comply? In fact, Your Honor, there was reasonable effort to comply. There's an entire business that the FTC investigated for two and a half years trying to find something to hold them in contempt that showed compliance with this order. The interpretation of the order when the FTC ---- Well, specifically with regard to the pieces of advertising at issue, what facts demonstrate reasonable compliance? Your Honor, in terms of the startercreditdirect.com portion, the defenders have taken responsibility for that. They said it's not a marketing piece. That they said that that marketing piece does have problems. And they are willing to be held liable for that marketing piece. But there's a big difference between that marketing piece and the super elite. And I would note, Your Honor, that there's been a lot of contamination of the evidence as to those two marketing pieces. The email banners that counsel just spoke about are for startercredit.com. They are not super elite. The lack of indication of the credit line being tied to membership is startercredit.com. It is not super elite. When the FTC brought this contempt proceeding against the defendants, they focused on startercredit.com. They did not focus on super elite because it was different. The FTC had that information. They questioned the defendants' principles six months before bringing the contempt action against them. They had all the information about super elite. They did not bring the case as it related to super elite. They made the change a week before the hearing. And the reason for that is they had figured out that the startercredit.com product was half a million dollars and super elite offer was $2.8 million. And it's been the FTC's purpose and motivation to put the defendants out of business. And that's what this sanction order does. And the judge does have to look at the sanction order, the burden the sanctions may impose on the contemptors' financial resources. That's the Henry Shrine case, as well as U.S. versus United Mine Workers. This order puts the defendants out of business. It destroys them financially. And it destroys them financially on one word, shopping. That's what this case comes down to. Should the defendants be held liable for almost $3 million because they said a century platinum membership credit line versus a century platinum membership shopping club line of credit. One word difference. And it was a word difference that the FTC did not see fit to bring, originally bring their contempt action. Thank you. Thank you, counsel. The case is targeted to be submitted. The Court will stand and recess for the day. Thank you.
judges: Reinhardt, Silverman, Nguyen